## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

Edward PETERS                          :
      Plaintiff,                      :
                                        :
v.                                     :        Case No. 3:04cv1066 (PCD)
                                          :
SIKORSKY AIRCRAFT CORP.                 :
      Defendant.                      :

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Edward Peters ("Peters") brings this action alleging discrimination based upon a physical disability (Count I) and breach of contract (Count II). Defendant Sikorsky Aircraft Corp. ("Sikorsky") moves for summary judgment on both counts of Plaintiff's Amended Complaint [Doc. No. 35]. For the reasons set forth herein, Defendant's Motion for Summary Judgment [Doc. No. 37-1] is **granted**.

## I. BACKGROUND

Defendant Sikorsky designs, manufactures and overhauls helicopters. Its main manufacturing plant is located in Stratford, Connecticut and it also maintains smaller Connecticut facilities in Bridgeport and Shelton. Sikorsky employed Plaintiff from 1988 until his layoff on January 12, 2001. Plaintiff primarily worked in the larger Stratford facility, but he also worked for short periods of time at its smaller Bridgeport and Shelton locations. Plaintiff was a member of the Teamsters Union, Local 1150 (the "Union") while he was employed at Sikorsky. A collective bargaining agreement ("CBA") between Sikorsky and the Union set forth, among other things, the rules that Sikorsky must follow when laying off and recalling employees. Employees are laid off and recalled by their non-interchangeable occupational groups in

accordance with seniority.  This process, and the definitions and parameters of these terms, are contained in the CBA, Article VIII, Sections 8.1-8.24 and Appendix A.

Plaintiff began his employment at Sikorsky in 1988 as a Riveter/Assembler.  After Plaintiff underwent surgery to his right wrist in 1991, his doctor gave him permanent medical restrictions that prohibited him from riveting and lock bolting.  Sikorsky attempted to find Plaintiff another position that would accommodate his restrictions and eventually, Sikorsky found Plaintiff a Labor Grade 9 Fork Lift Operator position on the first shift in its Bridgeport facility.  Later, he received a promotion to a Labor Grade 8 Fork Lift Operator position in the main Stratford plant.  As a Labor Grade 8 Fork Lift Operator, Plaintiff was responsible for moving material using two machines: a jitney vehicle (also called a "power ox") and a fork truck (also called a "fork lift").[1]  A Grade 8 Fork Lift Operator would also have to load and unload the wagon pulled by the jitney vehicle and could be assigned other duties.  In the Grade 8 position, Plaintiff estimated that he used the jitney vehicle 30% of the time, and the fork truck 70% of the time, until a second injury in 1996.

In 1996, Plaintiff's second injury to his right wrist meant that he could no longer physically drive the jitney vehicle.  Plaintiff's physician, Dr. Zaretsky, assessed a permanent disability rating for his right wrist of 27% and ordered that Plaintiff stop driving the jitney vehicle.  Sikorsky's Medical Department concurred with Dr. Zaretsky's order and Plaintiff never drove the jitney vehicle after 1996.  In 1997, Sikorsky issued Plaintiff a revised Medical

---

[1] During the time that Plaintiff worked as a Labor Grade 9 Fork Lift Operator in the Bridgeport facility, he used only the jitney vehicle.  The jitney vehicle pulls a wagon and delivers small parts and packages.  It is operated by manipulating handgrips that must be pressed to start, steer and stop the vehicle.  The fork truck is primarily used to move material on wooden pallets.  In contrast to a jitney vehicle, the fork truck has a wheel for steering and levers to raise and lower the boom.

Placement Report ("1997 MPL") at Dr. Zaretsky's request detailing his restrictions.[2]  Plaintiff testified that these medical restrictions have not changed since 1997.

After 1996, Plaintiff sought and was given a significant amount of family leave.  Plaintiff also took time off from work because of wrist pain.  Plaintiff used only a fork truck, and not a jitney vehicle, from 1996 until 1998 to perform his duties as a Fork Lift Operator.  The large Stratford facility had six other Fork Lift Operators on the first shift at this time.

In 1998, Plaintiff asked for a shift change to the smaller second shift to reduce his absences for family reasons.  Sikorsky tried to grant Plaintiff's requests by offering a number of temporary light duty jobs on the second shift that satisfied his medical restrictions.  Plaintiff performed various duties in all three of Defendant's Connecticut facilities during 1998, 1999 and 2000, including: placing nuts and bolts in UR bins, performing some crib attendant duties and kitting assembler jobs in both Stratford and Shelton, panel board maintenance duties, and fork lift work.  Some of these duties are light duty.  During these temporary assignments, Sikorsky maintained Plaintiff's title, hourly pay and labor grade of Fork Lift Operator.

On January 12, 2001, Sikorsky conducted a reduction in force that affected the Plaintiff's occupational group.  As a result, Plaintiff and four other employees in transportation were laid off.  The CBA provided employees laid off for lack of work with certain recall rights based upon their seniority.  When a position becomes available for recall, the Sikorsky human resources department contacts the most senior employee laid off in that occupational group.  If the laid off employee is interested in the position, he or she must complete pre-employment processing (including a medical exam, drug test and background check).

---

[2] The restrictions in the 1997 MPL are as follows: (i) minimal use of right hand with minimum grasping, (ii) no lifting over 10 pounds, (iii) no riveting or lock bolting, (iv) no repetitive gripping or grasping, and (v) no duties driving jitney vehicles (power oxs).

Sikorsky had an opening in one of the two Fork Lift Operator positions in its smaller Bridgeport facility in early 2002.  The other Fork Lift Operator position was held by a work leader that had more seniority and was two labor grades more advanced than Plaintiff.  On February 14, 2002, the Human Resources Department notified Plaintiff of this open position.

On February 26, 2002, Plaintiff attended his pre-employment processing at Sikorsky.  He continued to have the same restrictions set out in the 1997 MPR (including an inability to drive jitney vehicles).  Plaintiff assumed that the duties of the Bridgeport position were the same as the duties of the Fork Lift position Sikorsky had been able to modify to accommodate his restrictions four years earlier in Stratford.  However, after learning about Plaintiff's continued inability to use a jitney vehicle, Sikorsky notified him that he would not be called back because the position required someone to operate both the jitney vehicle and the fork truck.[3]  Sikorsky then filled the position with the next most senior person on layoff status.

As a result of the failed recall in 2002, Plaintiff filed a claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on September 3, 2002, claiming discrimination on the basis of disability.

In May 2003, another open Fork Lift Operator position became available in Sikorsky's Shelton facility on the second shift.  The position included operating a fork truck some of the time, going out into the yard to get parts, operating a scrubber, using hand tools, and other odd jobs.  The scrubber had hand controls like a jitney that required an operator to use his or her wrists to operate it.  Supervision for this open Shelton position was concerned that the

---

[3] Plaintiff's "denial" in his 56(a)(2) at ¶ 53 is not credited, because it does not deny Defendant's assertion that these were the reasons given for refusing to assign Peters to the 2002 open position.  (See Am. Compl. at ¶ 7.)  To the extent that Plaintiff denies Defendant's assertion that jitney vehicle duties were essential for the open position, see discussion infra Part III.A.2.ii.

restrictions in Plaintiff's 1997 MPR would prevent him from performing the job duties of the position.[4]

Nevertheless, Sikorsky contacted Plaintiff about this open position and he came in for a pre-employment medical screening on May 23, 2003.  Dr. Mongillo, one of Defendant's part-time physicians, examined him.  At the examination, Plaintiff wore a splint on his right hand and complained of pain, including parethesias (numbness), tingling, and pain in the arm.  Dr. Mongillo was concerned that a doctor had not seen Plaintiff since 2001.  Thus, he recommended that Plaintiff see Dr. Watson, a hand specialist, to get an objective diagnosis of Plaintiff's condition, comment on therapy, and give an opinion as to what Plaintiff's medical restrictions should be.  Dr. Mongillo told Plaintiff that Sikorsky would pay for the examination and that he must see a hand specialist for an evaluation.  While he recommended Dr. Watson, he later told the Plaintiff that he could see another doctor for the evaluation, provided the doctor was a hand specialist.

In addition to Plaintiff's conversation with Dr. Mongillo, the Sikorsky Medical Department and the Sikorsky Human Resources Department sent, and Plaintiff received, five letters trying to schedule an appointment for a hand specialist.[5]  Plaintiff did not answer the letters and he did not see a hand specialist.[6]  As a result, Sikorsky did not make a further determination as to Plaintiff's restrictions or his ability to perform the job at the Shelton plant. Pursuant to the last letter (dated November 20, 2003), Plaintiff's lack of response by December

---

[4] Plaintiff's response to Defendant's factual assertions in its 56(a)(1) Statement at ¶ 60 is not responsive to the facts asserted therein.  See discussion infra Part III.A.2.ii.

[5] The letters were dated May 30, 2003, July 23, 2003, August 13, 2003, August 28, 2003 and November 20, 2003.

[6] Plaintiff's denial of Defendant's factual assertion in its 56(a)(1) Statement at ¶ 75 is not responsive to the facts asserted therein, because ¶ 75 simply quotes Peters' deposition testimony.  However, the Court credits additional facts that Plaintiff alleges in his 56(a)(2) Statement at ¶ 75, adequately supported by citations to the record.

4, 2003 led Sikorsky to presume that he had chosen not to pursue any further employment with

Sikorsky.  On December 4, 2003, Plaintiff amended his complaint at the CHRO to include

allegations that Sikorsky discriminated against him on the basis of disability by not placing him

in the Shelton position in 2003.

Plaintiff filed his Amended Complaint ("Am. Compl.") with this Court on June 16, 2005.

Peters alleges that the layoff and two failed recalls constitute discriminatory employment

practices based upon a physical disability in violation of Conn. Gen. Statute § 46a-60 (Count I).

He also alleges that these events constitute a breach of the CBA between Sikorsky and his Union

(Count II).

## II.  STANDARD OF REVIEW

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admission on file, together with the affidavits . . .

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The mere existence of an alleged factual

dispute is not, by itself, sufficient to defeat a motion for summary judgment.  Anderson v. Liberty

Lobby, Inc. 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The adverse party

must provide sufficient evidence to demonstrate that there is a genuine issue of material fact.  See

id. at 248-49.  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  Id. at 248.  The court

must view the facts in the light most favorable to the adverse party and draw all inferences in its

favor.  See Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).  However,

"an adverse party may not rest upon the mere allegations or denials of the adverse party's

6

pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

## III. DISCUSSION

Defendant argues in its briefs that both Counts I and II are preempted by the Labor Management Relations Act ("LMRA") because they require analysis of, and are dependent on, a collective bargaining agreement. As explained below, Count I for discriminatory employment practices is not preempted by the LMRA, but summary judgment is granted to Defendants on other grounds. Count II for breach of the CBA is preempted by the LMRA, subject to a six-month statute of limitations, and since the action was not filed within six months, summary judgment is granted to Defendants as to Count II.

### A. **Count I: Discriminatory Employment Practices**

In Plaintiff's Am. Compl., he identifies three separate incidents of alleged discrimination based on his physical disability: the January 2001 layoff, the February 2002 failed recall ("2002 Recall"), and the May 2003 failed recall ("2003 Recall"). Each of these events will be treated separately.

#### 1. **The January 2001 Layoff**

In Count I, Plaintiff alleges that his layoff in January 2001 "was prompted by the physical disability of the plaintiff" and this layoff constitutes a discriminatory employment practice in violation of Conn. Gen. Statute § 46a-60. It is unnecessary for the court to consider Defendant's LMRA preemption argument with respect to Count I and the 2001 layoff, because the Plaintiff

failed to exhaust his state administrative remedies under the Connecticut Fair Employment

Practices Act ("CFEPA").

A plaintiff bringing a civil action for employment discrimination under the CFEPA must

first file a "timely complaint" with the CHRO and then obtain a release from the commission.

Conn. Gen. Stat. § 46a-100, 46a-101.  The CFEPA states that an administrative complaint must

be filed within 180 days with the CHRO in order to be timely.  Conn. Gen. Stat. §§ 46a-82.

However, Plaintiff was laid off on January 12, 2001 and did not file a claim with the

CHRO until September 3, 2002, almost twenty months later.  The administrative complaint is

certainly not "timely" under the requirements of the CFEPA, and therefore, the Plaintiff did not

exhaust his state administrative remedies, as set by the legislature, with respect to the January

2001 layoff.[7]  See Sullivan v. Board of Police Comm'rs, 196 Conn. 208, 215-16 (1985) (holding

that plaintiff's failure to follow administrative route set in the Connecticut statute gives plaintiff

no authority to pursue his claim in civil court).  Consequently, Plaintiff's claim under Conn. Gen.

Stat. § 46a-60 regarding his January 2001 layoff is dismissed and summary judgment is granted

to the Defendants as to this claim.

---

[7] Plaintiff appears to misconstrue Defendant's arguments regarding the exhaustion of state administrative remedies.  Plaintiff writes that "[s]ince the plaintiff admits that his second count is governed exclusively by the LMRA, defendant's contention that plaintiff has failed to exhaust his state administrative remedies becomes irrelevant, as such state administrative procedures are only a prerequisite to a suit under the CFEPA."  (Pl.'s Opp., Section II.B.)  However, Defendant actually argues that Plaintiff's failure to exhaust his administrative remedies is applicable to Count I, the state law discrimination claim. (Def.'s Memo, Section II.C.)  The exhaustion of state administrative remedies is clearly relevant for the purposes of the state law claim of employment discrimination (Count I).  Therefore, Plaintiff implicitly concedes that the 180 day administrative requirement is a prerequisite to filing a CFEPA suit in civil court here.

2. **The 2002 and 2003 Recalls**

i. **LMRA Pre-emption**

Defendant argues that Plaintiff's state law disability discrimination claim based upon the two recalls is preempted by § 301 of the LMRA.  Defendant maintains that the claims are founded upon recall rights created by the CBA, and the Court will have to interpret the terms of the CBA to resolve these claims.  The Court disagrees.

Although § 301 of the LMRA is facially a grant of jurisdiction to the federal district courts, it has been construed to be a source of substantive law as well, giving federal courts the authority to fashion a uniform federal common law to resolve disputes over collective bargaining agreements.  See Textile Workers v. Lincoln Mills, 353 U.S. 448, 456, 77 S. Ct. 912, 1 L. Ed. 2d 972 (1957); Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-104, 82 S. Ct. 571, 7 L. Ed. 2d 593 (1962).  In Lucas Flour, the Supreme Court analyzed the preemptive effect of § 301 and stressed that uniform interpretation of collective bargaining agreements according to a federal body of common law would allow parties to negotiate and administer these agreements with certainty and efficiency.  Id.

Accordingly, the Supreme Court has held that this federal interest in uniform interpretation of collective bargaining agreements may preempt certain state-law tort actions. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210-11, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985) ("Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.").  If resolution of a state law claim depends upon analysis of the terms of a collective bargaining

agreement, then § 301 pre-empts the claim.  Id. at 220.[8]  However, when a state law claim can be resolved without interpreting the collective bargaining agreement, the claim is independent of it and not preempted by § 301.  See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 409-410, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988).

Defendant maintains that the right to recall is created by, and completely dependent upon the CBA.  Defendant argues that any claim based upon the recall is therefore preempted.  In support of this assertion, Defendant cites a number of cases where claims were preempted because the right or duty a plaintiff sought to be enforced was derived from a collective bargaining agreement.  For example, in Allis-Chalmers Corp., a state tort suit for bad faith failure to pay benefits was preempted because the implied covenant of good faith and fair dealing, contained in all contracts, established the duties and rights at issue.  471 U.S. at 216-17.  Likewise, in United Steelworkers of America v. Rawson, a state tort claim that a union negligently failed to inspect a mine pursuant to a collective bargaining agreement provision was also held to be preempted, because the union's duty to inspect did not exist independently of the agreement.  495 U.S. 362, 371, 110 S. Ct. 1904, 109 L. Ed. 2d 362 (1990).  This Court held that a claim for negligent infliction of emotional distress is preempted where the collective bargaining agreement set the duty owed to plaintiff.  Almonte v. Coca-Cola Bottling Co., 959 F. Supp. 569, 576-77 (D. Conn. 1997).

---

[8] As this Court has noted, the Supreme Court has articulated multiple standards to decide if a state law claim is preempted by § 301.  Preemption is necessary for "claims that are 'founded directly on the rights created by collective bargaining agreements,' claims that 'require[] the interpretation of a collective bargaining agreement,' claims that are 'substantially dependent on analysis of a collective bargaining agreement,' claims that are 'inextricably intertwined with consideration of the terms of the labor contract,' and claims that assert rights 'derived from the contract.'"  Williams v. Comcast Cablevision of New Haven, Inc., 322 F. Supp. 2d 177, 182 (D. Conn. 2004) (internal citations omitted).

In the context of recall rights contained in collective bargaining agreements, Defendant cites Zimmer v. AT&T, 947 F. Supp. 302 (E.D. Mich. 1994), aff'd mem., 78 F.3d 585 (6th Cir. 1996) (holding that tort claims alleging breach of a duty of care concerning the processing of an employee's recall interest form were preempted).  Defendant also cites a decision where this Court held that an employee's claims for violations of his recall and seniority rights under a collective bargaining agreement were preempted, because the prohibition of the defendant's actions was governed by the agreement.  Petrucelli v. Cytec Indus., No. 3:95-cv-1055 (AHN), 1996 U.S. Dist. LEXIS 22498 at *15 (D. Conn. 1996).

As the caselaw cited above demonstrates, a claim alleging a failure to recall pursuant to a CBA may be preempted where the underlying duty to recall arises from the CBA.  However, the Court believes that Plaintiff's discrimination claim concerns rights and duties that exist independently of the CBA.  In this regard, Plaintiff's argument is more persuasive.  Sikorsky has indeed "attempted to conflate the issue of whether the Plaintiff was entitled to be recalled[,] which may implicate the [CBA]," with the question of whether the Plaintiff has a right not to be denied a position based upon a physical disability, which may constitute discrimination as it and does not implicate, but arises apart from, the CBA.  (Pl.'s Opp., Section II.B.)

The caselaw Defendant cites concerns mostly state law tort claims that are essentially a claim for contract breach, and where the defendants would have no duty to refrain from their allegedly wrongful conduct absent the CBA.  Although Zimmer seems to suggest that all claims based upon recall rights in a CBA are preempted, the Sixth Circuit's holding is inapposite here. The claims in Zimmer alleged a breach of a duty of care concerning the processing of the employee's recall interest form, and certainly, no such independent duty of care exists aside from

the CBA.  947 F. Supp. at 306-307.  However, duties and obligations regarding alleged

discrimination do exist independently from the CBA, and these are based on state law.  In

Petrucelli, this Court held preemption was appropriate for a claim of intentional infliction of

emotional distress, noting that "plaintiff has not alleged any specific actions whose prohibition

[have] an independent basis in state law."  1996 U.S. Dist. LEXIS 22498 at *15.  Peters, on the

other hand, alleges actions that are prohibited by the state law of Connecticut and this claim,

although related to the right to recall found in the CBA, is sufficiently independent of the CBA to

avoid preemption.

        Additionally, Defendant argues that resolution of Plaintiff's discrimination claims will

not simply require reference to the CBA, but its analysis and interpretation does and therefore,

this claim should be preempted.  Defendant cites a First Circuit case, Fant v. New Eng. Power

Serv. Co., 239 F.3d 8, 15-16 (1st Cir. 2001), where a state law claim for discrimination was

preempted because the conduct at issue constituted a breach of duty under the CBA and

resolution of the dispute hinged upon interpretation of the CBA.  Similarly, this Court held that

claims of fraud and intentional infliction of emotional distress were preempted because

resolution of the claims required interpretation of a collective bargaining agreement's terms

regarding negotiations and modifications to that agreement.  Dittman v. GMC-Delco Chassis

Div., 941 F. Supp. 284, 289 (D. Conn. 1996), aff'd mem., 116 F.3d 465 (2d Cir. 1997).

        However, as demonstrated infra in Section III.A.2.ii, resolution of Plaintiff's physical

disability discrimination claim does not require analysis and interpretation of the CBA.  While

Defendant is correct in pointing out that the CBA contains various provisions regarding layoffs,

recalls and seniority, the Court is unaware of any specific terms or provisions that govern the

actual recall procedure after the initial notification of an open position.[9]  Instead, our inquiry is a fact-bound analysis and will not require interpretation of the CBA.

In Count I, the Plaintiff is not arguing that Defendant interfered with rights stemming from the CBA.  Instead, Plaintiff claims Defendant violated an independent right under the CFEPA to be free from employment discrimination.  The Court is not aware of instructive caselaw in this jurisdiction where, as here, a Plaintiff alleges employment discrimination in the context of a recall.  The difficulty is that, without the right to recall in the CBA, Plaintiff's state law rights against employment discrimination could not be exercised at all.  Additionally, "[t]he boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive."  Wynn v. AC Rochester, 273 F.3d 153, 158 (2d Cir. 2001).  This line is even more elusive where the rights to recall are found in the CBA, but a plaintiff's claims are based upon state anti-discrimination statutes.

The Court concludes that Plaintiff's state law discrimination claim is sufficiently independent of the CBA to avoid preemption.  The cases cited in Plaintiff's Opposition, mostly from the Sixth Circuit, are instructive.  Plaintiff relies upon Lingle, which held that since plaintiff's retaliatory discharge claim did not require interpretation of the CBA, preemption was inappropriate.  486 U.S. at 314.  In Smolarek v. Chrysler Corp., 879 F.2d 1326, 1335 (6th Cir. 1989), the court held that because resolution of claims for retaliatory discharge and handicap discrimination would not necessitate interpretation of a collective bargaining agreement, these claims were not preempted.  Although these cases do not involve rights to recall specifically, they

---

[9] It would be a different situation if the CBA set forth the process whereby an employee notified of an open recall position could be denied, or if it outlined the decision-making process to be followed when making job re-assignments.  Cf. Zimmer, 947 F. Supp. 302 at 306-307 (noting that the CBA contained terms that required the employer to present the employee with a "complete termination packet" including a recall interest form, and tort claims based upon a failure to follow this process were preempted).

do apply to claims that an employer discriminated on the basis of a disability.  Thus, they are

persuasive where a claim is founded upon independent state rights which do not require

interpretation of a CBA.[10]  A similar conclusion can be found in the Second Circuit's <u>Wynn</u>

decision.  In that case, a plaintiff's misrepresentation claim was not preempted by § 301, even

when it was based upon rights to employee benefits and recall found in the collective bargaining

agreement.  <u>Wynn</u>, 273 F.3d at 159.  The court noted that "[r]eference to the CBA may be

needed, but . . . [s]tate law – not the CBA – is the source of the rights asserted by plaintiffs: the

right to be free of economic harm caused by misrepresentation."  <u>Id.</u>

      Furthermore, application of state law to Count I will not implicate the policy interests of

the Supreme Court in promulgating a uniform federal labor law.  In <u>Allis-Chalmers Corp.</u>,

although the Court held that the tort claims were preempted by § 301, it also noted that "in

extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be

inconsistent with congressional intent under that section to pre-empt state rules that proscribe

conduct, or establish rights and obligations, independent of a labor contract."  471 U.S. at 212.

Where a plaintiff's age discrimination claims arose under New York state laws, one court held

that "[i]t cannot be said that such a claim is, in reality, one under § 301 of the LMRA."  <u>Intern'l</u>

<u>Assoc. of Machinists & Aerospace Workers v. Gen. Elec. Co.</u>, 713 F. Supp. 547, 554 (N.D.N.Y.

1989).  The court's ruling was consistent with the federal interest in a uniform labor law policy,

---

[10] Additionally, the Sixth Circuit applied a <u>Lingle</u> analysis to state handicap discrimination claims and followed <u>Smolarek</u> in <u>O'Shea v. The Detroit News</u>, 887 F.2d 683, 687 (6th Cir. 1989) (holding that despite an employer's possible defenses (based on a CBA) about its right to make a certain employment decision, "[t]he point is that Michigan employees have the right not to be discriminated against on the basis of age or handicap without regard to the collective bargaining agreement's language about an employee's rights"); <u>see also</u> <u>Welch v. General Motors Corp.</u>, 922 F.2d 287, 290 (6th Cir. 1990) (affirming the district court's ruling that even where a CBA provides a remedy for discrimination, independent state statutory rights could be asserted because "the right to be free from handicapped discrimination was created by the [Michigan Handicapper's Civil Rights Act] and not solely by the collective bargaining agreement").

14

because it did not involve the breach of a duty stemming from a CBA, and "the heart of the plaintiff's claims against [GE] arise under the laws of the State of New York and are not generally of the sort which may be negotiated away at a bargaining table." Id. at 554-55. Plaintiff's claim of physical disability discrimination is similarly an assertion of state law rights, which arise independent of the CBA and will not implicate federal labor law policy.

With regard to the two failed recalls, Plaintiff's Count I claim that Sikorsky's employment practices constituted discrimination is not preempted by § 301 of the LMRA.

### ii. **Discriminatory Employment Practices Claim**

Under the CFEPA, it is a discriminatory employment practice "to refuse to hire or employ or to bar or to discharge from employment any individual . . . because of the individual's . . . physical disability." Conn. Gen. Stat. § 46a-60(a)(1). Courts construe disability discrimination claims brought under the CFEPA similarly to those brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Connecticut courts review federal precedent concerning employment discrimination for guidance in enforcing the CFEPA. Worster v. Carlson Wagon Lit Travel, Inc. 353 F. Supp. 2d 257, 267 (D. Conn. 2005); Levy v. Commission on Human Rights & Opportunities, 671 A.2d 349, 355 (Conn. 1996). Courts employ the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Hill v. Pfizer, Inc., 266 F. Supp. 2d 352, 359 (D. Conn. 2003) (explaining that a plaintiff must first demonstrate a *prima facie* case of discrimination, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext); see also Levy, 671 A.2d at 357-58 (same). "The burden of proof that must be met to permit an employment discrimination

plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimus*." Hill, 266 F. Supp. 2d at 359.

Under Connecticut law, as under the ADA, to establish a *prima facie* case of discrimination, Plaintiff must show that (1) he was a member of a protected group; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination. Shaw v. Greenwich Anesthesiology Assocs. P.C., 137 F. Supp. 2d 48, 64-65 (D. Conn. 2001); Curry v. Goodman, CV020817767S, 2004 Conn. Super. LEXIS 3481 at *14-15 (Conn. Super. Ct. 2004).

The Court finds that Defendant's evidence is sufficient to defeat Plaintiff's *prima facie* case with regard to both failed recalls. The Plaintiff has not met his burden of demonstrating evidence sufficient to create a genuine issue of material fact to survive summary judgment on Count I. Specifically, Plaintiff cannot prove the second element of his *prima facie* case, that he was qualified for the open recall positions, with or without reasonable accommodations.

## 1. **2002 Recall**

In order to make out his *prima facie* discrimination case, Plaintiff must demonstrate that he is qualified for the positions at issue. E.g., Shaw, 137 F. Supp. 2d at 64-65. In determining if a plaintiff is "qualified," courts look to whether or not the employee can perform the essential functions of the job. Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99-100 (2d Cir. 2003); Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999). Although the term "essential functions" is not defined in the ADA itself, the Equal Employment Opportunity Commission ("EEOC") defines the term in its ADA regulations to mean "the fundamental duties

16

of the position in question, but not functions that are merely marginal." <u>Mitchell</u>, 190 F.3d at 8

(internal citation omitted); <u>see also</u> <u>Shannon</u>, 332 F.3d at 100.  The regulations illustrate possible

reasons a given function may be considered "essential."  29 C.F.R. § 1630.2(n).  Specifically

applicable to Defendant's proffered evidence, "[t]he function may be essential because of the

limited number of employees available among whom the performance of that job function can be

distributed."  <u>Id.</u> § 1630.2(n)(2)(ii).  Also, a court must give "considerable deference to an

employer's judgment regarding what functions are essential for service in a particular position."

<u>Shannon</u>, 332 F.3d at 100 (internal quotations and citations omitted); <u>see also</u> <u>Cheatwood v.</u>

<u>Roanoke Indus.</u>, 891 F. Supp. 1528, 1537 (N.D. Ala. 1995).

      With respect to the 2002 Recall, Defendant offers evidence to show that operating the

jitney vehicle was an essential function of the open position in the Bridgeport facility.  Plaintiff

admitted in his deposition that, as a Labor Grade 9 Forklift Operator, he and others used only the

jitney vehicle.  Once he was promoted to Labor Grade 8, he began using the fork truck also.  He

also admitted that until his 1996 injury, he used the jitney vehicle 30% of the time, and the fork

truck 70% of the time.  Furthermore, Scott Katchmar, a supervisor in the transportation

department in 2002, states in his affidavit that an individual filling the open position in

Bridgeport in 2002 had to operate both the jitney vehicle and the fork truck.  This is because the

Bridgeport facility had only one other Fork Lift Operator besides the position to be filled.  The

existing Operator was a working leader with more seniority than Peters, and he was in a better

labor grade.  Plaintiff worked as a Fork Lift Operator and only used a fork truck in the Stratford

plant between 1996 and 1998, but there were six other Operators on Plaintiff's shift in the larger

facility.  Defendant claims that this allowed the Plaintiff to temporarily operate only the fork

17

truck (and not the jitney vehicle), because other Operators could use the jitney vehicles when necessary. Plaintiff, however, maintains that operating the jitney vehicle was not essential to the position, and his medical restrictions therefore did not prevent him from performing the duties of the open position. Though unable to use a jitney vehicle, Plaintiff nevertheless argues that he was qualified for the 2002 Bridgeport position since he was able to perform the work required of him using only a fork truck between 1996 and 1998, before his layoff.

To the extent this argument is made to rebut Defendant's assertion that using a jitney vehicle was an essential function for the Bridgeport position, it fails to create a genuine issue of material fact. Plaintiff states that he "was able to perform all work necessary to his position of forklift operator between 1996 and 1998 without accommodation of any kind, except such accommodation as he made for himself." (56(a)(2) Statement at ¶ 44.) However, this conclusory statement does not effectively deny the fact that the 2002 open position in Bridgeport required the use of both a jitney vehicle and fork truck. Plaintiff does not point to any evidence in the record that this open position would not require an operator to use a jitney vehicle.

Uncontested evidence shows that Plaintiff himself used a jitney vehicle 30% of the time prior to his injury in 1996, the open position was available in a different and smaller facility, and there was only one other Fork Lift Operator there. As the EEOC ADA regulations instruct, a function may be essential if a limited number of employees are available to perform that function, and if the employer actually requires employees in the position to perform the function it claims is essential. 29 C.F.R. § 1630.2(n). The fact that Plaintiff was able to perform all of the required work by utilizing only a fork truck in the larger Shelton facility four years earlier is not

18

sufficient to create an issue of fact as to whether using a jitney vehicle was an essential function for this position.[11]

It is undisputed that Plaintiff could not perform tasks that required using a jitney vehicle. After his 1996 injury, Plaintiff's doctor ordered him to stop operating jitney vehicles, and he could not and did not drive one after 1996.  His 1997 MPR stated that he had minimal use of his right hand with minimal grasping, and could perform no duties driving jitney vehicles.  These restrictions remain unchanged.

Consequently, Plaintiff does not offer sufficient evidence to show he was qualified for the 2002 position because he does not refute the fact that using a jitney vehicle was an essential function for the 2002 Bridgeport position, and it is undisputed that the Plaintiff is unable to use a jitney vehicle.[12]  "Employers formulate jobs to fit the needs of their enterprises . . . [and] the essential character of a particular job qualification is therefore a matter of judgment and opinion."  Shannon, 332 F.3d at 102-03.  It is clear that Plaintiff did not drive a jitney vehicle due to his medical restrictions between the 1996 injury and the 2001 layoff, and this modification was a departure from the normal duties performed by other Fork Lift Operators.  Plaintiff does not point to any facts that suggest a Fork Lift Operator could perform his job exclusively with a fork truck, without passing jitney vehicle duties on to other Operators.  And as the record indicates, Fork Lift Operator duties could vary depending on the facility, shift, and time period.

---

[11] Additionally, Plaintiff admits that he did not know the details of the open Bridgeport position, did not ask, and assumed the duties would be the same as they were four years earlier in Stratford.  (56(a)(2) Statement ¶¶ 51-52.)

[12] Plaintiff's assertion that he was cleared by the Sikorsky medical department in 2002 to return to work as a Forklift Operator is based upon a MPR Work Sheet, dated February 26, 2002 and attached to Plaintiff's Brief as Exhibit 8. However, the worksheet is not signed by a doctor and states on its face that "THIS IS NOT A PERMANENT RECORD."  Plaintiff does not offer any reason why the Court should credit the worksheet as evidence that Plaintiff was qualified for the open position.  The MPR Work Sheet is simply a worksheet.  Though it appears Plaintiff was initially cleared for work with restrictions on this handwritten form, it was subsequently amended by hand to read "Placement NOT Accepted."  The document is not a finalized MPR that returns an employee to work.

Nothing in the record states that an open recall position should only include duties identical to those performed by the employee in that position prior to a layoff.[13]  The limited personnel in the Bridgeport facility, along with the fact that the time and place in which Plaintiff worked from 1996 to 1998 allowed certain modifications to be made to the position, is sufficient to show that driving a jitney vehicle was an essential function.

Plaintiff also claims that Defendant's failure to recall him for the 2002 Bridgeport position is discriminatory because Defendant did not make any attempt to reasonably accommodate the Plaintiff's restrictions.  "The CFEPA has also been interpreted to require an employer to reasonably accommodate disabled employees."  Hill, 266 F. Supp. 2d at 364.  However, it is well established that "[a] reasonable accommodation can never involve the elimination of an essential function of a job."  Shannon, 332 F.3d at 100 (citation omitted).

Plaintiff suggests that Sikorsky could make a reasonable accommodation by eliminating jitney vehicle responsibilities or requiring the more senior Fork Lift Operator in Bridgeport in 2002 to use the jitney vehicle when necessary.  However, the law clearly does not require Defendant to accommodate Plaintiff's physical disability by eliminating essential functions from the job, and Plaintiff does not cite any authority that suggests otherwise.  See Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 140 (2d Cir. 1995) ("[I]ndividuals whose physical condition precludes them from engaging in heavy lifting, and who seek jobs for which such lifting is shown to be an essential function, need not be accommodated by shifting responsibility for the lifting to other individuals.") (citation omitted); Gilbert v. Frank, 949 F.2d 637, 643-44 (2d Cir. 1991) (holding that employee's suggestion that other workers could lift mailbags that

---

[13] The Court notes that engaging in an analysis of duties and essential functions that a recalled employee can be expected to perform requires interpretation of the terms of the CBA, and would therefore be preempted by § 301 of the LMRA.

were too heavy for him was not a reasonable accommodation because it eliminated an essential function of the job); Drew v. Sears, Roebuck & Co., No. 3:95cv1746 (PCD), 1997 U.S. Dist. LEXIS 23843 (D. Conn. 1997) (holding that employee must be able to perform the required functions of a position with the accommodation suggested, and employer is not required to modify the actual duties of the job for employee). As the Second Circuit stressed in Borkowski, a plaintiff must show an accommodation is available that allows the plaintiff to perform the essential functions of the job by introducing evidence that such an accommodation exists and would permit the employee to perform the job at the same level as a non-disabled employee. 63 F.3d at 141.[14]

Aside from the accommodations referenced above which eliminate an essential function of the job, Plaintiff has not identified other effective and reasonable accommodations that potentially render him otherwise qualified for the position. To withstand a motion for summary judgment, the Plaintiff must identify a reasonable accommodation which, if implemented, would permit him to perform the essential functions of the job. See Kennedy v. Dresser Rand Co., 193 F.3d 120, 122 (2d Cir. 1999), cert. denied, 528 U.S. 1190, 120 S. Ct. 1244, 146 L. Ed. 2d 103 (2000). Because Plaintiff has failed to meet this burden and establish a genuine issue of material fact as to his qualifications for the 2002 Bridgeport recall position, summary judgment is granted to Defendants on Count I and the 2002 Recall.

---

[14] To the extent that Plaintiff suggests that Sikorsky should have measured his qualifications against the modified position he held in the Stratford facility, the Seventh Circuit has held that an employee's qualifications must be measured against the duties of his original position and not a temporary or modified position assigned as a result of injury. Malabarba v. Chicago Tribune Co., 149 F.3d 690, 696 (7th Cir. 1998).

### 2. <u>2003 Recall</u>

With regard to the 2003 recall in Shelton, Plaintiff's Opposition is devoid of any arguments that contradict Defendant's assertions.  From the Facts section of Plaintiff's Opposition, however, it appears as though Plaintiff claims Defendant's request that he see a hand specialist was unreasonable, because Sikorsky had not requested such an opinion before.  The Plaintiff does not cite any authority to suggest that it was unreasonable for Dr. Mongillo and Sikorsky to make this request, however.  Plaintiff admits that Dr. Mongillo would allow him to see another doctor for the evaluation, as long as it was a hand specialist.  Additionally, the undisputed evidence indicates that it was Plaintiff's failure to answer five separate letters requesting medical records and his refusal to see a hand specialist which led to Sikorsky's assumption that Plaintiff no longer sought employment at Sikorsky in December 2003.  Peters has not come forth with any explanation that would provide legal justification for his own failure to participate in the process.

Therefore, Plaintiff has not offered sufficient evidence regarding the 2003 Recall to meet the burden of a *prima facie* case of discrimination.  Statements found in the Facts Section of his Opposition seem to attempt to create a genuine issue of material fact that he was qualified for the 2003 Shelton position.  Plaintiff claims that although Sikorsky expressed reservations about his ability to perform the job in 2003, these concerns were not genuine because they were not expressed at the time the Plaintiff returned to work after his injury in 1996.  (56(a)(2) Statement ¶ 60.)  Plaintiff does not, however, offer any support for his assertion that a request for a specialized medical examination <u>seven years later</u> is unreasonable.  Comparing the situation in

1996 to that in 2003, with respect to a position with different though analogous duties, does not create an issue of fact sufficient to survive summary judgment.

Furthermore, Plaintiff does not contradict the legal authorities Defendant cites which state that the ADA envisions an "interactive process," whereby employers and employees work together to evaluate whether an employee's disability can be reasonably accommodated.  Jackan v. N.Y. State DOL, 205 F.3d 562, 566 (2d Cir. 2000).[15]  Courts construing ADA claims recognize that medical inquiries may be necessary where an employer has genuine reason to doubt whether that employee can perform job-related functions.  Donofrio v. N.Y. Times, 99 Civ. 1576 (RCC)(JCF), 2001 U.S. Dist. LEXIS 13788 at *20-21 (S.D.N.Y. 2001), magistrate's decision adopted by, 2002 U.S. Dist. LEXIS 2399 (S.D.N.Y. 2002).  Since Plaintiff failed to submit to the independent examination requested by Defendant to determine what positions Plaintiff could qualify for, he cannot prove his *prima facie* case of discrimination.  See id. at *22; Thompson v. City of N.Y., 98 Civ. 4725 (GBD), 2002 U.S. Dist. LEXIS 23675 at *26 (S.D.N.Y. 2002).

Accordingly, this Court finds that the plaintiff has not met his burden of establishing a *prima facie* case of discrimination under the CFEPA with regard to either the 2002 Recall or the 2003 Recall.  Summary judgment is appropriate in favor of Defendant on Count I entirely.

---

[15] The Facts Section claims that an August 28, 2003 letter from Sikorsky requesting a hand specialist examination (the fourth such letter) "made clear to the Plaintiff that regardless of the report of the specialist, he would not be granted the fork lift position in Shelton."  (Pl.'s Opp., Facts Section, 2nd to last ¶); (56(a)(2) Statement, ¶ 75.) Presumably, Plaintiff offers this letter to show that Sikorsky would not put him in the open position even if he did participate in the interactive process.  However, the letter does not indicate what Plaintiff contends it does.  It merely says that the requested evaluation was not tied to a specific position at Sikorsky, but any number of open positions. In fact, such language seems to indicate that Sikorsky actively tried, from May until December of 2003, to ascertain Plaintiff's exact restrictions since the Shelton position (and possible other open positions) required Plaintiff to perform duties similar to those using a jitney vehicle.

23

**B.  Count II: Breach of Contract**

Count II of the Amended Complaint for breach of the CBA is completely preempted by §
301 of the LMRA, and this is not disputed.  The Court must construe and interpret the terms and
provisions of the CBA to decide Plaintiff's breach of contract claim and therefore, it is well
settled that federal labor law preempts the state law claim.  See, e.g., Allis-Chalmers Corp., 471
U.S. at 211 ("Questions relating to what the parties to a labor agreement agreed, and what legal
consequences were intended to flow from breaches of that agreement, must be resolved by
reference to uniform federal law."); Caterpillar, Inc. v. Williams, 482 U.S. 386, 394, 107 S. Ct.
2425, 96 L. Ed. 2d 318 (1987); Williams, 322 F. Supp. 2d at 183-84.

However, Defendant argues that Plaintiff's claims preempted by § 301 of the LMRA are
also barred by a six-month statute of limitations.  The Court agrees.  Plaintiff correctly notes that
a six-month statute of limitations applies to hybrid claims brought under § 301.  A hybrid claim
is one in which "an employee has a cause of action against both the employer and the union,
where the two claims are inextricably linked, and where the case to be proved is the same against
both." McKee v. Transco Products, Inc., 874 F.2d 83, 86 (2d Cir. 1989).  The Supreme Court, in
Delcostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 171-72, 103 S. Ct. 2281, 76 L. Ed. 2d 476
(1983), determined that because there is no federal statute of limitations that expressly applies to
such hybrid claims, the appropriate statute of limitations is the six-month time period provided
under § 10(b) of the National Labor Relations Act (29 U.S.C. § 160(b)).

Nonetheless, Plaintiff argues that his action is not such a hybrid claim because he sues
only his employer and therefore, the Connecticut six-year statute of limitations for breach of
contracts should apply.  The Second Circuit, however, has concluded that a hybrid claim is

24

presented if the plaintiff, in addition to suing the employer, can also bring a cause of action against a union for breach of the duty of fair representation (regardless of whether or not the plaintiff actually does bring the union action).  McKee, 874 F.2d at 86-87.  Indeed, the Plaintiff "cannot circumvent the six-month limitations period for hybrid actions by choosing to sue only [his] employer."  Id. at 86.  Instead, "what makes a case a 'hybrid' action against both union and employer is the nature of the *claim*, not the identity of the *parties*."  Id. (emphasis in original) (internal citations and quotations omitted); see also Carrion v. Enterprise Ass'n, 227 F.3d 29, 34 (2d Cir. 2000) (following McKee in holding that a six-month statute of limitations applies to an action for breach of contract brought against the employer only); Notice v. Chanler Lewis, Inc., 333 F. Supp. 2d 28, 30-31 (D. Conn. 2004) (same).[16]

Additionally, the Second Circuit has held that the mere presence of an arbitration clause in a CBA is enough to make an employee's claim a hybrid one and subject it to the six-month statute of limitations.  United Auto, Aerospace and Agric. Implement Workers v. R.E. Dietz Co., 996 F.2d 592, 596 (2d Cir. 1993) ("We hold that the mere presence of an arbitration clause implicates the federal interest in prompt, private dispute resolution in labor cases and requires application of the six-month statute of limitations."); McKee, 874 F.2d at 87-88 (noting the destructive effect upon CBA arbitration provisions if employees were allowed to bring claims of

---

[16] The single case Plaintiff cites to support his contention that Count II is not a hybrid claim is Cabarga Cruz v. Fundacion Eductitiva Ana G. Mendez, 822 F.2d 188 (1st Cir. 1987).  However, Cruz is unpersuasive.  It was decided before the relevant decisions in this jurisdiction regarding hybrid claims and therefore it does not take into account the standards set forth in McKee and Carrion.  Additionally, Cruz is factually distinguishable.  In that case, the court held that the claim was a pure breach of contract claim against the employer, because the facts demonstrated that plaintiff had no action against the union for breach of its duty of fair representation.  Cruz, 822 F.2d at 191.  Peters, however, stated in his deposition that the Union did not take his claim to arbitration or pursue the grievance procedures provided in the CBA.  (Peters Dep. at 79-80.)  Peters, unlike the plaintiff in Cruz, does have a possible claim against the Union for its failure to pursue his grievance, pursuant to the CBA.  See Allocco v. Dow Jones & Co., No. 02 Civ. 1029 (LMM), 2002 U.S. Dist. LEXIS 11690 at *21-22 (S.D.N.Y. June 27, 2002) ("Even though Allocco chose not to bring suit against the Union, it is clear from his allegations regarding the Union's failure to pursue his grievance that he has a fair representation claim against the Union."), citing McKee, 874 F.2d at 86-87.

breach of the agreement up to six years after the alleged violation); <u>Ycaza v. CT Transit-Stamford Div.</u>, 289 F. Supp. 2d 180, 183 (D. Conn. 2003).  Section 6.17 of the CBA between the Union and Sikorsky provides for mandatory arbitration in the event a contractual grievance is not settled through the required grievance procedures.  This arbitration clause subjects Plaintiff's claim for breach of the CBA to a six-month statute of limitations.

The record demonstrates that Count II for breach of contract is not timely under the applicable six-month statute of limitations.  The six-month period begins to run when the plaintiff discovers, or should have discovered, those acts that constitute the alleged violation of the agreement.  <u>E.g.</u>, <u>Ycaza</u>, 289 F. Supp. 2d at 183; <u>Wilhelm v. Sunrise Ne.</u>, 923 F. Supp. 330, 337 (D. Conn. 1995) (internal citations and quotations omitted).  In this action, the Plaintiff filed his first complaint with the Court in June 2004.  Therefore, the LMRA claim based upon his January 2001 layoff is untimely by about three years.  Defendant notified Plaintiff that he would not receive the first recall position in March 2002, and therefore the LMRA claim based upon the 2002 Recall is untimely by more than a year and a half.  Likewise, Defendant notified Plaintiff that he would not receive the second recall position on or about June 15, 2003,[17] and therefore the LMRA claim based on the 2003 Recall is untimely by about six months.  As a result, Plaintiff's Count II claims under § 301 of the LMRA fail as a matter of law, and Defendant is entitled to summary judgment on Count II entirely.

## IV.  CONCLUSION

The Court has considered Plaintiff's claims and finds them to be insufficient to survive Defendant's motion for summary judgment.  Count I fails because Plaintiff cannot make out a *prima facie* case of discriminatory employment practices.  Count II for breach of the CBA is

---

[17] Am. Compl. ¶ 11.

subject to a six-month statute of limitations and since the action was not filed within six months,

Plaintiff's claim fails as a matter of law.

     For the reasons stated herein, Defendant's Motion for Summary Judgment is **granted**.

The clerk shall close the file.


     SO ORDERED.

     Dated at New Haven, Connecticut, August  _10th_ , 2006.


                                     _____/s/_____

                                          Peter C. Dorsey
                                  United States District Judge